UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| JUAN SERRANO, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 2:19-cv-00494-JMS-MG |
| RICHARD BROWN, et al., | ) ) ) |
| Defendants. | ) |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Juan Serrano, an inmate at Wabash Valley Correctional Facility ("Wabash Valley") filed this civil rights suit alleging that his right to due process was violated when he was placed in administrative restrictive status housing ("ARSH") from February to July 2018 without meaningful review. Defendants Richard Brown, Kevin Gilmore, Jerry Snyder, Randall Purcell, Andrean Stroup,[1] and Breanna Trimble have filed a motion for summary judgment. For the foregoing reasons, that motion, dkt. [40], is **granted**.

I.
Standard of Review

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

---

[1] Named in the complaint as Andrea Mason.

1

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

## II.
## Motion to Strike

As a preliminary matter, the Court addresses the defendants' motion to strike Mr. Serrano's surreply. Dkt. 60. Under Southern District Local Rule 56-1(d), "A party opposing a summary judgment motion may file a surreply brief only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response. The surreply must be filed within 7 days after the movant serves the reply and must be limited to the new evidence and objections."

The defendants filed their reply brief on February 3, 2022. Dkt. 57. On March 4, 2022—over three weeks after the deadline—Mr. Serrano filedd his surreply and a supporting affidavit. Dkts. 58, 59. Mr. Serrano did not file a motion for extension of time or acknowledge the belatedness of his surreply when he filed it. For this reason, the motion to strike, dkt. [60], is **granted**. The **clerk is directed** to strike Mr. Serrano's surreply and affidavit, dkts. [58] and [59], from the record.

### III.
### Factual Background

Because the defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

#### A. The Parties

Mr. Serrano has been in the custody of the Indiana Department of Correction ("IDOC") since 2001. Dkt. 40-1 at 82:01-25. The defendants, all employees of Wabash Valley, were members of a classification committee responsible for conducting reviews and informing inmates regarding decisions, such as continued placement on ARSH. *Id.* at 34:03−15.

#### B. Prior Placement in ARSH at Wabash Valley and the STAND Unit

In 2011, an incident occurred resulting in a death of an inmate at an IDOC facility. Dkt. 12 at 4. An investigation ensued, and Mr. Serrano was placed on ARSH at Wabash Valley from July 2011 to December 2016.[2] *Id.*

In December 2016, Mr. Serrano was transferred to New Castle Correctional Facility ("New Castle"), where he was placed in the Striving Towards a New Direction ("STAND")

---

[2] Mr. Serrano's claims related to his confinement in ARSH during this timeframe were dismissed at screening as being barred by the two-year statute of limitations. Dkt. 7 at 3−4.

Program. Dkt. 40-1 at 15:05-17:13. The STAND Program is intended to help inmates like Mr. Serrano transition from long-term restrictive status housing into general population and consists of five phases, lasting a total of 12 to 15 months. *Id.* at 20:18−19, 92−93.

Mr. Serrano advanced in the STAND Program until he was involved in a multi-inmate altercation in July 2017. *Id.* at 23:6−10; 25:5−7. Mr. Serrano was found guilty of disorderly conduct because when the fight broke out he did not return straight to his cell or get on the floor. *Id.* at 24:16−20. As a result of the write-up, he was demoted back to Phase 1 of the STAND Program. *Id.* at 19:20-21; dkt. 40-2 at 6.

Mr. Serrano completed Phase 1 of the STAND Program again, but the STAND Unit Review Committee determined that he should remain in Phase 1, and Mr. Serrano requested to then be removed from the STAND Program and be transferred. Dkt. 40-1 at 19:16, 20:23-21:04, 25:09-15, 26:15-28:10; dkt. 40-2 at 8. As such, Mr. Serrano was considered a STAND Program failure and was notified that he was placed on a transfer list approved for any Level 3 (medium security level) IDOC facility. Dkt. 40-1 at 28:15-29:09, 30:01-17, 31:01-24, 94; dkt. 40-2 at 8.

**C. Return to ARSH at Wabash Valley**

The day before his transfer, Wabash Valley staff decided to place Mr. Serrano in ARSH based upon his STAND Program failure until they could talk to him to see what his goals and objectives were and then make a further decision. Dkt. 40-2 at 9.

On February 2, 2018, Mr. Serrano was transferred to Wabash Valley and placed in ARSH, where he met with Randall Purcell who provided him a packet of information and informed him that he was in ARSH at the direction of Warden Richard Brown. Dkt. 40-1 at 51:10-52:06; dkt. 40-2 at 9-10.

4

On February 23, defendant Jerry Snyder and non-defendant Frank Littlejohn met with Mr. Serrano in an office to discuss the July 2017 altercation at New Castle. Dkt. 40-2 at 11; dkt. 40-1 at 65:25-69:06. At the meeting, Mr. Serrano asked them why he was being housed in ARSH, and they told him it was because of the incident. *Id.* They had reviewed a video of the incident which Mr. Snyder described as follows: "Video showed a confrontation, Serrano leaves the area and returns with something in his hand, then passes it to someone else. A knife was found later and Frank and I believe that it [was] what he held in his hand." Dkt. 40-2 at 11. Mr. Serrano told them he was not involved in the fight. Dkt. 40-1 at 68:12−13. Mr. Snyder and Mr. Littlejohn concluded that Mr. Serrano was being deceitful, so they decided he would remain in ARSH and they would "review when he is clear of that incident for a year (7/19/18)." Dkt. 40-2 at 11.

Mr. Purcell prepared notes indicating he met with Mr. Serrano on February 7, February 14, February 21, February 28, and March 14, to discuss his continued placement in ARSH. *Id.* at 9−11. Mr. Serrano testified that they did not meet on these dates, but rather Mr. Purcell sent him paperwork through the prison mail system telling him about his continued placement. Dkt. 40-1 at 64:24−25−65:1−8. In the following weeks and months, Mr. Serrano periodically received classification paperwork regarding his continued placement in ARSH from some of the named defendants. *Id.* at 52:07-57:15. The reviews consisted of the same standardized language: "Your status has been reviewed and there are no changes recommended to the Warden at this time." Dkt. 12-1 at 12−15.

Other than disagreeing with their decision to keep him in ARSH, Mr. Serrano had no issues with the Wabash Valley staff. Dkt. 40-1 at 85:02-11. On July 10, 2018, Mr. Serrano was moved

5

to general population. Dkt. 40-2 at 13. In total, Mr. Serrano spent 158 days, or five months and 8 days, in ARSH.

**D. Conditions of ARSH**

While Mr. Serrano was confined in ARSH, he was in a cell with no windows for 23 hours a day. Dkt. 40-1 at 38:18−19. There were two lights in his cell; the smaller of the two stayed on 24 hours a day. *Id.* at 39:19−22. There were ants and small insects in the cell, but no other pests. *Id.* at 41:11−17. He was ineligible for a prison job while in ARSH. *Id.* at 49:24−25.

Whenever Mr. Serrano left his cell, he was handcuffed and escorted to recreation by an officer who held a "dog leash" that was connected to the handcuffs. *Id.* at 38:19−22. Mr. Serrano was provided an hour of recreation outdoors each day in a cage that was large enough to walk around and stretch his legs. *Id.* at 43:10−17. Mr. Serrano could not recall a day in which he was not taken outside. *Id.* at 44:17−20. He was provided three showers a week, for which he had warm water and soap. *Id.* at 38:23, 39:4−10.

While in ARSH, Mr. Serrano suffered no physical injuries and was not assaulted by any other inmates or Wabash Valley staff. *Id.* at 38:05−12. However, he suffered from headaches, cognition issues, and social skill deficits from his time in ARSH. *Id.* at 78:2−5 ("I get headaches now, stuff like that. Conversations – I go blank in the middle of a conversation. . . .And I never had that problem until I was in the SHU."), 79:2−6 ("[M]y social skills are not the same no more. I just – I'm not the same person, and I know it, you know. My family knows it, and everybody that knows me from before knows it."). Although these psychological and cognitive issues arose during his first time in ARSH from 2011 to 2016, they reemerged in the months he spent there in 2018. *Id.* at 78:6−22.

6

## IV.
## Discussion

The constitutional right at issue in this case is the due process clause. The due process clause "applies only to deprivations of life, liberty, and property." *Isby v. Brown,* 856 F.3d 508, 524 (7th Cir. 2017). When presented with a procedural due process challenge, the Court must engage in a two-step analysis. *Id.* It must first determine "'whether the plaintiff was deprived of a protected interest; if so, [it] determine[s] what process was due under the circumstances.'" *Id.* (quoting *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 673 (7th Cir. 2016)).

"Prisoners do not have a constitutional right to remain in the general population." *Id.* (citing *Sandin v. Conner*, 515 U.S. 472, 480 (1995)). Rather, a protected liberty interest "is triggered only when the confinement imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Lisle v. Welborn*, 933 F.3d 705, 721 (7th Cir. 2019) (cleaned up). The Seventh Circuit has not established a bright-line rule for the length of time an inmate must spend in segregation before his liberty interest is triggered, *Kervin v. Barnes*, 787 F.3d 833, 836−37 (7th Cir. 2015), though it has concluded that "six months of segregation is not such an extreme term and, standing alone, would not trigger due process rights." *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 698 (7th Cir. 2009). Instead, when deciding whether placement in segregation imposes atypical and significant hardship, the Court "look[s] to both the duration of the segregation and the conditions endured." *Lisle*, 933 F.3d at 721.

No rational jury could conclude that Mr. Serrano suffered from "atypical and significant hardship" given the conditions he encountered in ARSH and the relatively short duration of his time in segregation. *Id.* Mr. Serrano was in ARSH for about five months. He received an hour of outdoor recreation daily and showers three times a week. *See Hardaway v. Meyerhoff*, 734 F.3d

7

740, 744 (7th Cir. 2013) (no liberty interest implicated where inmate spent six months in segregation with a violent cellmate and "was permitted to use the shower and prison yard *once every week*") (emphasis added). He introduced no evidence that the cell was unsanitary, and he was not subjected to a pest infestation in his cell. *Lisle*, 933 F.3d at 721 (finding inmate introduced no evidence that rust on bars of cell and "corroded feces" in the toilet were unique to cells in segregation or caused the plaintiff hardship); *see also Stallings v. Best*, 2018 WL 4300488, *6 (N. D. Ill. Sept. 10, 2018) (collecting cases that hold that a six-month placement in segregation *with* pest infestations and unsanitary conditions does not implicate a liberty interest). Mr. Serrano was not able to have a job while in ARSH, but he introduced no evidence that inmates in general population tend to have jobs, or that the lack of job affected him in any way. In short, examining both the duration of segregation and the conditions endured, Mr. Serrano did not demonstrate that the conditions of his five-month segregation were so atypical as to implicate a due process liberty interest.

Because Mr. Serrano was not deprived of a liberty interest, the Court need not evaluate whether the procedures used to determine his continued placement in ARSH were constitutionally deficient. *Lisle*, 933 F.3d at 720.

The Court recognizes that, in total, Mr. Serrano spent nearly six years in segregation and has received psychological scars as a result. Mr. Serrano could not pursue his claim for the 2011−2016 period of segregation because it was barred by the statute of limitations, and his five-month stay in 2018 did not trigger due process protections. Thus, applying the controlling precedent of this Court, "this is one of those cases in which federal law leaves no one to blame legally." *Jump v. Vill. of Shorewood*, No. 21-2255, 2022 WL 3040894, at *8 (7th Cir. Aug. 2, 2022). The defendants' motion for summary judgment is **granted**.

8

## V.
## Conclusion

The defendants' motion to strike, dkt. [60], is **granted**. The **clerk is directed** to strike Mr. Serrano's surreply and affidavit, dkts. [58] and [59], from the record.

The defendants' motion for summary judgment, dkt. [40], is **granted**. Final judgment will issue in a separate entry.

**IT IS SO ORDERED.**

Date: 8/10/2022

*Hon. Jane Magnus-Stinson, Judge*
*United States District Court*
*Southern District of Indiana*

Distribution:

JUAN SERRANO
112300
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
6908 S. Old US Hwy 41
P.O. Box 1111
CARLISLE, IN 47838

All Electronically Registered Counsel